IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JUNE R. WILLIAMS, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| HARRIS COUNTY HOUSING AUTHORITY, | § § § § | |
| Defendant. | § | |

## MS. WILLIAMS'S ORIGINAL COMPLAINT, APPLICATION FOR PRELIMINARY INJUNCTION & PERMANENT INJUNCTION

### A. Preliminary Statement

1. Plaintiff, June Williams, is a disabled, indigent, African American woman, aged 63, who has resided in federally-subsidized housing since 2007. Defendant unreasonably and illegally discontinued paying rent as agreed since July 2014. As a result, Ms. Williams will be evicted from her home and rendered homeless. The reason given by Defendant for terminating Ms. Williams' housing subsidy was that she "violated her Family Obligations, Lease Agreement and Housing rules"; however, this was not true. Defendant's action in terminating Ms. Williams' subsidy violated the federal housing statutes and regulations governing the Section 8 Housing Voucher Program and constituted an arbitrary denial of Ms. Williams' constitutional rights, for which Ms. Williams seeks relief under 42 U.S.C. § 1983 for damages, declaratory relief and injunctive relief.

### B. Jurisdiction

2. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1337 and 1343 (through 42 U.S.C. § 1983).

### C. Parties

3. Ms. Williams is a citizen of the United States and a resident of Houston, Harris County.

4. Defendant Harris County Housing Authority ("HCHA") is a locally established and administered public body situated in Houston, Harris County, Texas. HCHA administers the federal Section 8 Housing Voucher Program.

D. <u>Statutory and Regulatory Background</u>

5. The United States Housing Act of 1937 (the "Housing Act"), 42 USC § 1437 et seq., was passed to provide affordable housing for eligible low-income families, the elderly, and persons with disabilities. One of the Housing Act's stated purposes was "to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families." 42 U.S.C. § 1437(a)(1). Another stated purpose was "to promote the goal of providing decent and affordable housing for all citizens…" 42 U.S.C. § 1437(a)(4). The Housing Act does this by subsidizing the rent of low-income, disabled and elderly people who participate in any of the many subsidized housing programs which were created pursuant of the Housing Act.

6. The Section 8 Housing Choice Voucher Program ("the Voucher Program") is a subsidized housing program created when Congress amended the Housing Act in 1983. 42 U.S.C. § 1437f(o). The Voucher Program is administered on a national level by the United States Department of Housing and Urban Development ("HUD"), which funds Public Housing Authorities ("PHA's") to administer the Voucher Program on a local basis. Under the Voucher Program, a PHA signs an annual contributions contract with HUD, which in turn authorizes the PHA to enter into contracts with participating landlords for housing assistance payments on behalf of qualified individuals.

7. The primary method by which individuals are admitted into the Voucher Program is by submitting an application for participation to PHA. Because the demand exceeds available vouchers, applicants are initially placed on a waiting list. When an individual is reached on the waiting list, she is issued a voucher if she then meets the Voucher Program's eligibility requirements. Once the voucher is issued, the individual has a limited time in which to find a

landlord willing to lease under the Voucher program, and to obtain the PHA's approval of the proposed home and of the proposed lease agreement.

8. When a voucher holder locates a landlord willing to lease under the Voucher Program, she must submit a request for lease approval to the HCHA. The HCHA inspects the dwelling to ensure it meets the necessary housing quality standards. Once the unit passes inspection, the Voucher Program participant signs a lease with the landlord. The HCHA simultaneously or subsequently signs a Housing Assistance Payments ("HAP") agreement with the landlord. The HAP agreement sets out the maximum amount of rent which the landlord may collect each month for the voucher holder, the amount of rent which the landlord shall be paid by the HCHA, and remedies which the landlord may exert when the HCHA's payments are late. 24 C.F.R. § 982.451(b). "The term of the HAP Agreement is the same as the term of the lease." 24 C.F.R. § 982.451(a)(2).

9. Once admitted into the Voucher Program, an individual is entitled to continue participation in that program so long as she meets the eligibility standards and otherwise complies with its legal obligations. The substance of these obligations is set forth in HUD regulations. 24 C.F.R. § 982.551, *et seq.* Among other things, the individual is obliged to participate in the annual recertification of the factors (income, disability, etc.) which qualify her to participate in the Voucher program. An individual may be terminated from the Voucher Program only on one of the grounds set forth by federal regulations.

10. A PHA which administers the Voucher Program on a local basis is required to strictly comply with the HUD regulations controlling that program. Among other requirements, the PHA is required to adopt a written administrative plan in "…accordance with HUD regulations and requirements." 24 C.F.R. § 982.54(b). That administrative plan must not only cover the PHA's policies on occupancy standards, but must also set out "[s]tandards for denying admission or terminating assistance based on criminal activity or alcohol abuse in accordance with § 982.553." 24 C.F.R. § 982.54(d)(3)(iii).

3

11. Any time a PHA proposes to terminate assistance to a current participant, the PHA must provide a prompt notice to the participant which states the reasons for the termination, sets forth the right to request an informal hearing, and states the deadline by which the participant must request an informal hearing. 24 C.F.R. § 982.555(c). For such proposed terminations of assistance to existing participants, the PHA must "give the opportunity for an informal hearing <u>before the PHA terminates housing assistance payments</u> for the family under an outstanding HAP contract." 24 C.F.R. § 982.555(a)(2) (emphasis added).

12. Under HUD regulations concerning "informal hearings," a current participant must be allowed to: engage in discovery; be represented by counsel; present evidence; and cross examine the PHA's witnesses. 24 C.F.R. § 982.555(e). After the hearing, the hearing officer "must issue a written decision, stating briefly the reasons for the decision. Factual determinations relating to the individual circumstances of the family shall be based on a preponderance of the evidence presented at the hearing. A copy of the hearing decision shall be furnished promptly to the family." 24 C.F.R. § 982.555(e)(6).

### E. HCHA'S Written Policies

13. The HCHA promulgated its own written policies, which are set forth in its "Administrative Plan." Chapter 17 of the Administrative Plan incorporates HUD's requirements for termination notices and hearings and expressly includes the requirement for a written termination notice which states the reasons for the termination. At the termination hearing, the Administrative Plan also imposes the requirement that the hearing officer will consider the materials introduced by the parties and give such information consideration and due weight. After the hearing, the Administrative Plan requires the hearing officer (within fourteen days of the hearing) to serve the participating family with a written decision which sets out a clear summary of the decision and reasons for the decision. Under the Administrative Plan, the factual basis for that decision must be based upon a preponderance of the evidence presented at the hearing.

14. In Chapter 18 of the Administrative Plan, the HCHA adopted written policies setting forth the procedures to be followed in terminating the assistance of a program applicant who misses an initial appointment, who is given a second opportunity to schedule an appointment, and who then misses that rescheduled appointment. Under such circumstances, the Administrative Plan requires a termination notice to be issued "for failure to supply required information…" Chapter 18 further provides:

> If the tenant appeals a termination letter for missing both, first and second, appointments, an informal hearing must be scheduled. At that hearing, the tenant must submit 'acceptable documentation/evidence showing why she/he could not appear for the appointment. If the documentation/evidence indicates that tenant could not have reasonably been expected to kept the appointment, another appointment should be scheduled. No more than two appointments will be granted.

### F. Facts

15. Ms. Williams is a disabled, diabetic, indigent African American woman, aged 63, residing in federally-subsidized housing at 607 Thornton Rd., No. 235, Houston, Harris County, Texas 77018, since 2007.

16. HCHA has failed to pay her rent subsidy since July 2014, and has scheduled a hearing to formally terminate that rent subsidy on December 18, 2014.

17. The decision by HCHA to terminate her rent subsidy will result in Ms. Williams being left homeless and unable to pay for food and medicine, which she needs to survive.

18. Given HCHA's previous decision not to pay her rent, which decision was made, effectively July 31, 2014, with no rent paid from August forward, the decision was made without a hearing as required by HCHA's administrative plan and HUD procedures. The outcome of the December 18, 2014, is a foregone conclusion. Ms. Williams raised complaints about the complex, and thereafter her unit is inspected and she is essentially cited for the issue she has complained about.

19. The reason given by Defendant for terminating Ms. Williams' housing subsidy was that she "violated her Family Obligations, Lease Agreement and Housing rules" in that she allegedly

failed three "Housing Quality Standard Inspections on May 8, 2014, May 28, 2014, and June 13, 2014. HCHA asserts that she had "excessive debris in the unit and for not allowing the unit to be treated for bedbugs…" However, as recently as February 2014, her unit was inspected and approved by HCHA for continued occupancy by her.

20. HCHA's actions stem from long-standing insect infestation that has permeated the entire complex where Ms. Williams resides. Ms. Williams has repeatedly complained about the conditions at the complex. Ms. Williams has documented her ordeal in considerable detail, and it appears the landlord and HCHA tired of her complaints.

21. In the spring of 2012, the landlord implemented a program of unit-by-unit extermination. The residents were each instructed to lay out their belongings to allow heat treatment to permeate all areas of the unit. Reasonable accommodations requested by Ms. Williams were denied by HCHA and the landlord.

22. On or about Saturday May 3, 2014, without notice, unidentified men demanded access to Ms. Williams' home. With no notice of any inspection by HCHA or the ability to independently speak to any representative of HCHA, Ms. Williams denied access. There was a history of males seeking access to the units in the complex, and women have been attacked on the premises. Moreover, in the absence of a tenant responding to knocks or to voice demands for access, keys have been used to enter the units. Reports of threats to the safety of the tenants within the subject units were disregarded by the landlord and HCHA.

23. HCHA subsequently mailed a notice to Ms. Williams of their intention to inspect the unit on May 8, 2014. Because of her medical issues, Ms. Williams requested to reschedule the inspection until she was able to stabilize her medical conditions. The written request was denied by HCHA.

24. On May 8, 2014, an inspector known to Ms. Williams (he had inspected the property previously) appeared at the unit for inspection. Not only did he fail the unit, characterizing her personal property as "debris," he made threats of future failures. The inspector was provided

evidence of a long-standing bedbug infestation, and the landlord's refusal to provide reasonable accommodation that would not jeopardize her health.

25. On or about May 26, 2014, Ms. Williams and the landlord came to terms about access to the unit to carry out the extermination effort involving the use of heat to eradicate bedbugs. However, the landlord's worker also chemically sprayed her unit without giving notice. Because of her history of asthma and reactive airway disease, a proper airing out of the unit was vital to her health and safety.

26. HCHA advised of a May 28 inspection. On or about the morning May 27, 2014, Ms. Williams notified HCHA that the inspection would need to be rescheduled, as the heat treatment would not be completed.

27. After the heat treatment concluded on May 28, 2014, and because of the chemical spray, Ms. Williams, who suffers from asthma, requested an accommodation from the landlord to move to a different unit to allow the landlord's chemical treatment concentration to dissipate. There were at least two (2) unoccupied units in proximity. One of the units had been proposed and remained empty until June 2014.

28. The history of refusal to accommodate Ms. Williams was a pattern. After protracted refusals to accommodate, the landlord allowed her to move to another unit for one night, the night before the scheduled HCHA inspection. The landlord then prematurely revoked the accommodation the next day. Having experienced breathing difficulties after entering the unit, the respiratory difficulties persisted for the next couple of weeks. On or about June 3, 2014, the onsite medical staff conducted a medical exam, found breathing difficulties and issued an inhaler to prevent escalation of Ms. Williams' respiratory problems.

29. During the cooling-off period following the removal of the heaters from the unit, on May 28, 2014, while she was doing laundry in a common laundry room, unbeknownst to her, an HCHA inspector entered her unit without her permission and failed the unit because of the existence of "debris." Ms. Williams was still in the process of restoring her unit after the

extermination treatment and had not completed the process. An HCHA inspector apparently trespassed into her unit to carry out this unauthorized inspection. HCHA failed to provide written notice of its presence and result of their May 28, 2014 inspection, until a review of its file occurred in connection with a notice to terminate the rental subsidy. In May 2014, in compliance with instruction from the HCHA employee with whom Ms. Williams spoke to reschedule the inspection of her unit, she also notified HCHA and the landlord of the existence of vermin not eradicated and the need for an additional bedbug heat treatment. No treatment was forthcoming, but a Notice to Quit was served by the landlord.

30. On June 13, 2014, an HCHA inspector inspected the unit and failed it without stating his findings when asked by the onsite monitor on duty. Ms. Williams had notified HCHA and the landlord of vermin in the common kitchen, steps away from her unit and an adjacent unit, heavily infested with vermin required sealing up to prevent proliferation. The inspector was taken to the common kitchen, and he failed that part of the common area that had been "passing" inspection for years, despite the conditions of the walls and floor that were deplorable.

31. On October 27, 2014, HCHA employee, HCHA Executive Director, Tom McCasland appeared unannounced at her unit and demanded access, presumably to inspect it. Without notice of his intent to appear that day or any other, Ms. Williams, then suffering from mobility issues involving her legs, declined to provide access. Absent retreatment of the unit to address the continued vermin infestation, another inspection will only result in a failed inspection, giving HCHA the excuse it seeks to terminate Ms. Williams' rent subsidy.

32. HCHA is relying upon these three purportedly failed inspections on May 8, May 28, and June 13, 2014, to terminate her rent subsidy. However, a review of HCHA's records revealed that HCHA had already breached its obligation to pay Ms. Williams' rent by failing to pay it since July 2014. See Exhibit A hereto. Additionally, on August 5, 2014, HCHA negotiated a resolution with legal aid clinic counsel for Ms. Williams, in which HCHA agreed not to terminate her rent subsidy. See accompanying email of Adeline Benoit dated August 5, 2014, attached as

Exhibit B. HCHA's email stated "After review of Ms. Williams' file Harris County Housing Authority will not proceed with the termination of her assistance." *Id.* Despite this previous decision, HCHA has recanted and implemented termination proceedings on precisely the same basis, except rather than attribute the infestation problem to the landlord, as in their May 15, 2014 letter (see Exhibit C), HCHA now attributes that long-standing problem to Ms. Williams. See Exhibit D.

33. Ms. Williams has allowed the landlord to undertake monthly extermination treatments and to carry out the overnight heat treatment of her unit to eradicate the vermin infestation. She has allowed access to her unit upon reasonable notice. She has not allowed access to her unit without her consent or when demands were made to enter without proper notice.

34. The landlord instituted a state-court suit to evict Ms. Williams from her unit. The landlord non-suited that case on September 22, 2014.

35. Ms. Williams believes that the landlord and HCHA are acting in concert and in retaliation for raising myriad valid complaints about the complex.

36. The HCHA did not make any payments to Ms. Williams' landlord since July 2014. Ms. Williams' landlord is currently threatening to evict Ms. Williams for non-payment of rent on account of the HCHA's failure to make such payments.

## G. Causes of Action

37. This is an action brought under the Supremacy Clause, as set forth in Art. VI, Cl. 2 of the United States Constitution. This action is also brought under 42 U.S.C. § 1983, seeking to redress the deprivation, under color of state law, of rights, privileges or immunities secured by the Constitution and laws of the United States.

### First Cause of Action: Termination Notice

38. As a participant in the Voucher Program, Ms. Williams had an enforceable interest in the continued receipt of the benefits accorded her by the program. While she was an existing participant in the Voucher Program, the HCHA served Ms. Williams with a termination notice

which was vague and inaccurate and thus failed to adequately inform her of the grounds for her termination from the Voucher Program. That notice was so vague on its face that it cannot support the termination of Ms. Williams' benefits under the Voucher Program. By serving Ms. Williams such a vague and inaccurate notice, the HCHA violated the guarantee of procedural due process promised by the Fourteenth Amendment of the United States Constitution, which is actionable under 42 U.S.C. §1983.

### Second Cause of Action: Denial of Due Process of Law

39. The HCHA must give the opportunity for an informal hearing before it terminates payments for the family under the outstanding HAP contract. 24 C.F.R. § 982.555(a)(2). *Miles v. Phoenix City Housing Authority*, 2011 U.S. Dist. LEXIS 69814 (M.D. Al. 2011) (granting preliminary injunction ordering PHA to reinstate plaintiff's subsidy retroactive to date of termination).

### Third Cause of Action: Termination Grounds

40. After Ms. Williams began participating in the Voucher Program, she was entitled to continue participation so long as she continued to meet the program's eligibility requirements and so long as she met her family obligations. When HCHA constructively terminated Ms. Williams' assistance, she was still eligible for that assistance, and she had not violated her family obligations.

41. Ms. Williams had not violated her family obligations when her unit was inspected on May 8, 2014. Ms. Williams voiced complaints about vermin infestation of the complex for over 24 months, and the inspector then cites her instead of the complex May 8 for having evidence of roaches and bedbugs. This after a February 2014 inspection found no problems with her particular unit despite ongoing vermin infestation of the entire complex.

42. Ms. Williams had not violated her family obligations with respect to the May 28, 2014, inspection which was conducted prior to completion of bedbug treatment which required the tenants to leave their possessions spread out so that they could be treated for the infestation.

The HCHA inspector then enters her property without consent or notice and cites her for having "excessive debris" i.e. her personal belongings spread out in the unit, and "trip hazard" on the floor.

43. Ms. Williams had not violated her family obligations with respect to HCHA's unannounced inspection on June 13, 2014. Ms. Williams was not the cause of the vermin infestation.

44. The grounds for Ms. Williams' constructive termination were arbitrary and capricious and violate the Housing Act of 1937, applicable HUD regulations, and the HCHA's own administrative Plan. This baseless termination of Ms. Williams' assistance caused her to lose rights to continued benefits under the Voucher Program.  Such conduct violates the guarantee of substantive due process promised by the Fourteenth Amendment of the United States Constitution, and is actionable under 42 U.S.C. § 1983.

## H. Request for Temporary Restraining Order and Preliminary/Permanent Injunction

45. Ms. Williams will suffer irreparable injury if Defendant is not enjoined during the pendency of this lawsuit from terminating her rent subsidy and eviction from her residence.

46. There is a substantial likelihood that Ms. Williams will prevail on the merits because the HCHA's basis for termination of payments and from the Voucher Program is arbitrary and capricious and wholly without merit.  Specifically, Ms. Williams permitted the unit to be treated for vermin infestation on May 27, 2014, and she was not responsible for such infestation found in her unit on May 8, 28, and June 13, 2014.  Moreover, while HCHA inspectors characterize her personal property as "excessive debris," neither "debris" nor "excessive debris" has been defined, nor has any evidence been produced that such "excessive debris" caused the vermin infestation.  HCHA's reliance upon such undefined standards is arbitrary and capricious.  Further, Ms. Williams has been forced to leave her belongings out for purposes of treatment,

and she keeps some of her property inside of bags to keep out the vermin. The unit requires retreatment for vermin infestation before a proper inspection can be carried out.

47. The threatened harm to Ms. Williams is irreparable and outweighs the harm a preliminary injunction would inflict on Defendant. If HCHA terminates Ms. Williams' rental subsidy, she will become homeless and unable to keep her medical conditions, including diabetes, under control. In effect, the decision to terminate her rental subsidy will jeopardize her life.

48. Ms. Williams asks the Court to set her application for preliminary injunction and temporary restraining order for emergency hearing at the earliest possible time and, after hearing the application, issue a preliminary injunction against Defendant. HCHA has scheduled an informal hearing for this Thursday, December 18, 2014, at 2:30 p.m., to address its decision to formally terminate her rent subsidy. Because the outcome of that hearing is a foregone conclusion, Ms. Williams seeks this Court's intercession to maintain the status quo until the unit is retreated for vermin infestation and placed in a condition to pass HCHA's housing quality standards.

I. Prayer

WHEREFORE Ms. Williams respectfully requests that this Honorable Court:

a. find that Defendant violated Ms. Williams' rights under both federal law and regulations and the United States Constitution by its actions;

b. declare the HCHA's purported termination of assistance to Ms. Williams under the Section 8 Housing Voucher Program effective July 31, 2014, to be void;

c. order the Defendant to immediately reinstate Ms. Williams to the Section 8 Housing Voucher Program, and enjoin the HCHA from continuing in its failure to pay rent for Williams under the Program;

d. grant Ms. Williams judgment against Defendant for her actual damages, including emotional distress;

e. award Ms. Williams her costs of court; and

f. award Ms. Williams such other and further relief to which she may be entitled.

Respectfully submitted,

Keith B. Letourneau
Texas Bar No. 00795893
Federal ID No. 20041
BLANK ROME LLP
700 Louisiana, Suite 4000
Houston, Texas 77002
(713) 228-6601
Fax (713) 228-6605

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRIC OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JUNE WILLIAMS<br>　　Plaintiff | §<br>§<br>§ | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| HARRIS COUNTY<br>HOUSING AUTHORITY<br>　　Defendant | §<br>§<br>§ | |

**VERIFICATION**

Pursuant to 28 U.S.C. §1746, June R. Williams declares under the penalty of perjury:

1. "I have read the foregoing Original Complaint, Application for Preliminary Injunction and Permanent Injunction and the factual allegations set forth therein are true and correct."

I declare under penalty of perjury that the foregoing is true and correct.

Dated:　　December _16_, 2014
　　　　　　Houston, Texas

_____
June R. Williams